All right, our second case is number 19-11909, United States v. Yamilet Diaz. And before we begin, and so that I don't forget, Mr. Feigenbaum, I know that you were court-appointed for Ms. Diaz, so on behalf of the court, I want to thank you very much for your representation of Ms. Diaz and for the assistance you've provided her and the district court and us in this case. We do appreciate it. Whenever you're ready, you can begin. Yes, thank you, Judge Jordan. Again, I'm Marty Feigenbaum, representing appellant Yamilet Diaz. I'd like to address issue 4 relating to the guidelines calculation that Judge Kahn approved. We are asking the panel to vacate the appellant's sentence because Judge Kahn did not correctly calculate the guidelines. We argue this point, this issue, in the initial brief at pages 36-42 and in the reply brief at pages 12-15. The total offense level should be reduced by four levels for loss amount and three levels for aggravating role. This would make Ms. Diaz's total offense level 22 with a guidelines range of 41-51 months instead of the 87-108 months which Judge Kahn approved. Now, we filed extensive objections to the PSI and a reply to the government's response. These objections are found at docket entries 115 and 122, also, again, in the initial brief at pages 36-46. The government did not meet its burden by the required preponderance standard to prove those aggravating factors. The government's argument is in its answer brief at pages 40-49. It did not, the government did not reference specific and reliable testimonial or physical evidence to support the loss amount or the aggravating role. Mr. Feigenbaum, on that issue, what do you think was the highest loss amount that the government was able to prove, either through the evidence at a trial or other documentary or testimonial evidence? Your Honor, it was $306,000 which was the amount of kickbacks which Ms. Cowell, the owner of Good Friends Home Health Agency, said she paid to Ms. Diaz. And there were checks to support $306,000. Now, the $600-some-thousand the government argues for as to just Good Friends itself relates to its argument that it's the amount of benefit Medicare conferred on Good Friends, not the amount of kickbacks paid to Ms. Diaz. And I'll tell you why that's wrong. That $600,000 figure, which does make a difference because I believe the guidelines tell us that when you get above $550,000, you have a 14-level increase instead of a 12-level increase, which we're saying applies if the conviction is proper and so forth. And the reason why the $600,000 government argued conferred benefit to Good Friends does not work is because the two cases that the government relied on in its answer brief were United States v. Huff and United States v. Nare. The Huff case is not a Medicare case. It was a fraud case about supplying material to an Air Force base. The other case, Nare, was a Medicare case. But in that case, the court found that the home health agencies at issue had submitted patient claims using inflated invoices. So in this case, as we did in our objections to the PSI, we relied on a Judge Faye opinion in United States v. Medina, which is a very important case for us. And the reason is because in Medina, Judge Faye tells us that Judge Faye did not accept the government's position, which is the same position the government argues here, the conferred benefit argument. Judge Faye found in Medina, which is 485 Fed 3rd 1291, an 11th Circuit case from 2007, Judge Faye found that the government had failed to prove that the higher loss amount related to claims, which there had to be proof they were not medically necessary or not delivered to the patients. So when the government failed to prove that, Judge Faye found that the lower loss figure, the amount of kickbacks paid to the defendants, was the proper measure. In this case here, there is nothing in the trial record or anywhere else where the government ever proved that anything Good Friends furnished in terms of Medicare services to the patients at issue were not medically necessary or were not provided. Therefore, the lower amount, the actual check amounts paid to DS, which again I think was $306,000, should prevail over the higher figure of conferred benefit on Good Friends due to the failure of the government to show that Good Friends provided services that were not and billed for services that were not medically necessary or not provided. So when you go to the $306,000 figure, you get a 12-level increase over the base offense level of 8, and you end up with a total there of 12 plus 8, 20. Now, as to aggravating role, the government failed to prove an aggravating role. The evidence, and again we went through this very carefully in our objections and our reply to the government's response to our objections, the government absolutely failed to prove that DS did anything except basically sell patient names to Good Friends, and then Good Friends used these patients to do whatever they did. And that is insufficient to assign DS an aggravating role. You would have to have the government prove things like a claimed right to a larger share of the fruits of the crime, a planning and organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. We find these factors in an important case that we cited also in our objections to the PSI, which is United States v. Martinez, 584, Fed 3rd, 1022, an 11th Circuit case from 2009. Mr. Feigenbaum, what did the district court say or what did it agree with to impose the aggravating role adjustment? Well, Your Honor, the judge agreed with basically what was a government proffer that DS coached patients, what to say, she met with doctors to help organize the wrongful issue of plans of care, that she did other things, but yet nobody came in and said that I know that DS coached patients. Two minutes, Mr. Feigenbaum, two minutes. Thank you, Stephanie. So the government just completely failed too. The government basically, if you look at the record, made a proffer that DS coached patients, she met with doctors, she paid off patients, some kind of a portion of the kickback, and she paid doctors, but there was no evidence. Nobody came in and could actually say that happened. So the government proffered, the judge accepted, a zero evidence for an aggravating role does not meet the preponderance standard, and as the panel can see, we rely heavily on one of the important cases from the 11th Circuit, United States v. Lawrence, 47, Fed Third, 1559, an 11th Circuit case from 1995. The government, you know, the obligation of the government is not toothless. It must have reliable and specific evidence, even by a preponderance, to prove any aggravating factor. Mr. Feigenbaum, did you accept the facts in the government's proffer or not? No, no, no. We're confident that the trial record reflects objections at every point in time to any proffer attempts by the government and its failure to provide reliable and specific facts to the court to support any of these aggravating factors of sentencing. Okay. And listen, I appreciate very much the time the panel has given me, and I'll stop at this point and turn the floor over to the government. All right, Mr. Feigenbaum, you've saved your time for rebuttal. Thank you very much. Thank you, Your Honor. Mr. Rotker. Judge Jordan, sorry, this is Tom Barrera again. I do apologize, but the system is nonresponsive, so I'm going to ask Mr. Rotker, will you please press star six to unmute you? Very good. Thank you, sir. I do apologize. I don't know why it's acting up. That's all right. No problem. The apology is on my end. Can everyone hear me clearly? Yes. Very good. Thank you, Your Honors, and may it please the court, Michael Rotker from the Department of Justice, on behalf of the Appalee, the United States of America. Let me just respond on the two sentencing issues that Mr. Feigenbaum just raised, and I would like to begin, Judge Jordan, with your question about what the district court found with respect to the role in the offense, and then I'll turn back to the value of the benefit conferred. The district court, as to both of these determinations, made specific and detailed findings that are amply supported by the evidence in the record. I understand Mr. Feigenbaum is characterizing this as proffers. This is based on the evidence in the trial record. So there was no, Mr. Rotker, just one procedural question before you go into your argument. The government then, for example, on the aggravating role adjustment, did not present any additional evidence. At the sentencing hearing, it was relying on the evidence presented at trial? Yes, Your Honor. And the same goes for the loss amount, is that correct? Yes, Your Honor. Okay, thank you. Go right ahead. Thank you. And on the aggravating role, and I'm reading from volume 3B of the joint appendix, starting at the bottom of page 33 and then spilling over onto page 34, the court's ruling on the aggravating role was as follows. With respect to the defendant's objection to the three-level enhancement, the court finds, by a preponderance of the evidence, that the defendant exercised decision-making authority in that she dictated the amount she would be paid in kickbacks for each patient, that is $2,200. She most importantly recruited the accomplices, that is, the Medicare beneficiaries. She took the patients to clinics to obtain prescriptions for them. She coached the patients on what to say to help them obtain the prescriptions. The court further finds that the defendant introduced Ms. Cao of Good Friends to another patient recruiter, Ms. Aguila, so that Ms. Aguila could refer additional Medicare recruits. Ms. Diaz formed consulting billing, a shell corporation, which was specifically designed to receive the illegal kickback payments. Ms. Diaz recruited in excess of 150 patients for which Medicare was billed by the home health agencies. The court further finds that Ms. Diaz's degree of participation in the planning or organizing of the offense was substantial. Her degree of control and authority exercised over the patients recruited was extensive. Therefore, the court finds the three-level enhancement for manager or supervisor applies, and the objection is overruled. I don't have much more to say except that the trial record bears out the district court's findings, and the court, I'm confident, can look at the record and see that. So Mr. Fagenbaum is calling this a proffer and saying there's no evidence, but there is abundant evidence to support each of the district court's subsidiary findings upon which it predicated that enhancement. If the court has no additional questions on that point, let me turn to the value of the benefit conferred. And here I am again in Volume 3B of the Joint Appendix, which is all part of the sentencing transcript. And at page 24 of the ‑‑ page 25 of the transcript, the sentencing court said, and I'm quoting again, the court finds by a preponderance of the evidence that the improper benefit conferred was greater than $1.5 million. I won't read it in great detail, but the court then broke down further and talked about how much Medicare paid to Good Friends and how much it paid to the other home health agencies that were in question, and on that basis it adopted the $1.6 million calculation. That is a correct application of the law under 2B4.1. It is the improper value of the benefit conferred. It's not simply the amount that was kicked back, that she received in kickbacks. It's the benefit that Medicare ‑‑ it's what Medicare paid out. And as far as Mr. Feigenbaum's claim that there was no evidence to support this ‑‑ And so, Mr. Rucker, hold on, hold on one second. I think if I understand Mr. Feigenbaum's argument correctly, it's that in a case like this one involving kickbacks, you only take the amount of the benefit conferred as the loss amount if the benefit itself was medically unnecessary or not provided at all. In other words, if I can put it in practical terms, if a Medicare beneficiary that Ms. Diaz referred to Good Friends was in medical need of prescriptions, of medications, had them lawfully prescribed by a doctor, she would have gone to some pharmacy somewhere to get the medication and Medicare would have paid for the medication, then I think what Mr. Feigenbaum is saying is you don't count the amount paid by Medicare for the prescription as part of the loss amount. I think that's his argument. So if I understand it correctly, I'd like you to respond to the legal aspect of his argument. Your Honor, I appreciate the question. While Your Honor was speaking, I went back and I've been looking at the defendant's opening brief and I didn't actually understand that to be the argument that he raised in his papers. That may well be the argument he was presenting here this morning. I'm referring to the argument that he made here today. And so we'll obviously take a look at whatever arguments were properly raised in the brief, but since you're here, I'd like you to respond to that argument as well, too, please. Sure. I mean, to be candid, Your Honor, the reason I brought up that, I don't think I'm prepared, I don't think I have an answer to that, except to say what we argued below in the district court, which is that the value of the benefit conferred is not limited to the kickback amount, even in the hypothetical, even in the scenario that Your Honor pointed out, that we're focusing on what Medicare paid out. And so I would urge the court to look at the briefs carefully because I feel a little bit taken by surprise by the legal argument that Mr. Feigenbaum was raising. So I don't have a comprehensive answer to Your Honor's question, to be completely candid. Okay. But I would say that I would just urge the court, again, if you look at volume 3B of the joint appendix where the district court made its ruling, what we understood the arguments to be are, and as Mr. Feigenbaum did say this morning, that there's no evidence to support them. And what I was saying on the value of the benefit conferred, if you look at page 23 of the sentencing transcript, the government specifically told the court where the evidence was to support the 1.6 figure. It referred to government exhibit 540, which was a summary chart admitted at trial, which showed the loss amounts that were paid to the various beneficiaries that were recruited by Ms. Diaz. It also referred to trial testimony from Ms. Aguila, who was another one of the patient recruiters. So, again, the suggestion that there's no evidence is belied by the very sentencing transcript that's before the court right now. And so I think the government would respectfully submit that if you read the transcript, the sentencing court dotted the I's, it crossed the T's, it made the necessary factual findings by preponderance of the evidence, and the record evidence backs up those findings. Unless the court has further questions for me about these issues or any of the other issues, I'm happy to see back the balance of my time. Mr. Rocker, I do have a question for you. This is Jill Pryor. My understanding is that the benefit conferred enhancement is based on a conspiracy theory of foreseeable actions of co-conspirators. But I don't believe the co-conspirators were actually identified in the record, were they? They were not formally recognized, but there was discussion in the record about the Medicare beneficiaries being viewed as unindicted co-conspirators. And is there evidence in the record that the beneficiaries, the patients, were knowingly engaged in the conspiracy? Not as to all of them, Your Honor. I don't know the answer to that, Your Honor. I don't believe so, but that's the way they were characterized and viewed by the parties. I do also want to emphasize, though, that for purposes of the relevant conduct, it isn't only the joint foreseeability. There is also the other provision in the 1B1.3, the relevant conduct guideline, that talks about acts and omissions that were aided, procured, in furtherance. It's not just in furtherance of the conspiracy. It's relevant conduct as to the offense itself. So you have both prongs of the relevant conduct guideline that provide the legal footing for the court's $1.6 million calculation. All right, Mr. Rucker, thank you very much. Thank you, Your Honors. I appreciate your time. Thank you. Mr. Feigenbaum, whenever you're ready, you've got your rebuttal time. Yes. Thank you, Judge. Let me first address the first comments that Mr. Rucker made. If panel would refer to page 36 of the initial brief, where issue 4, my issue 4 that I argued earlier, begins, you'll see the first sentence says, On April 16, 2019, Diaz filed her objections to the PSI DE-115, pages 1 through 17. And then I make references to different things that I objected to in the PSI, and it includes role assessment, loss amount, and so forth, and cites pages from the objections that I was referring to. This I consider to be fair notice to the government that I was relying on my objections to the PSI, 17 pages of them, including a memo of law towards the end, that cited to the same cases that I did earlier in my argument today. There is no surprise. There's nothing I said that the government was not on full notice that I was relying on the objections and the legal cases, such as Medina, to which I referred in my earlier argument. Let me turn now to the issue of aggravated role and the loss amount. Those two things, let me just say this. I noticed the government read from Judge Kahn's findings at the sentencing hearing that he was going to approve the government's arguments as to aggravated role and loss amount. But really, it's the same thing I was saying before. What the government's argument is here today, just as it was at the sentencing, is that you should accept this judge because we say so, not because somebody came to trial and testified to that. For example, as to aggravated role, Judge Kahn, as Mr. Rutgers said, dictated the price, which is, I don't see how that is an aggravating role, dictating the price. In a buyer-seller relationship, the seller says, here's the price. Will you accept it? That's not part of management or supervision of anything in an organization, especially with five unnamed people. Maybe one was named, but not all five. Recruited accomplices. There's no evidence that she recruited accomplices, except that one day she brought witness Abigail Aguila to Good Friends and introduced her, and then Ms. Cal, the owner of Good Friends, took it from there. What about the district court's statement that she also coached the beneficiaries and took them to Good Friends and maybe other pharmacies? How does that play into the equation? No evidence of that, Your Honor. No evidence. No evidence of coaching patients. No evidence of recruiting 150 patients. A list of patients was sold to Ms. Cal at Good Friends. That's the extent that the record reflects was the relationship between Ms. Diaz and Ms. Cal. As to loss amount, again, the government just says there were $993,000, I think it is, of money that Ms. Diaz got from other home health agencies. You've seen the charts that the government prepared. You see what was admitted at trial. But nobody came in from those other agencies and said, We sent Diaz checks for patient kickbacks because she sold us patients and we gave her kickbacks. We don't know what those checks were for, and the government had a responsibility as an aggravating factor to increase the loss amount. The government had a responsibility to bring in somebody from those agencies and say, Yes, we sent her these checks. Here they are. We did it for this reason. So we don't know whether it was for money laundering or for some other purpose or even for Hector Hernandez, which was during material times in a relationship with Ms. Diaz, and he had signing authority on one of the two bank accounts. Again, in sum, I may have gone over my time. In sum, these are conclusory allegations. The government did not meet its burden, and we're asking the court to please consider having a total offense level of 22 instead of 29, and I really appreciate the time you've given me. All right. Thank you both very much, Mr. Feigenbaum and Mr. Rucker. We really appreciate it. Thank you, Your Honors.